IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| PAUL REED CONSTRUCTION & SUPPLY, INC., a Nebraska corporation, | **CASE NO. 8:12CV48** |
| Plaintiff and Counter Defendant, | |
| vs. | **MEMORANDUM AND ORDER** |
| ARCON, INC., a Colorado corporation, | |
| Defendant and Counter Claimant. | |
| _____ | |
| ARCON, INC., a Colorado corporation, | |
| Third-Party Plaintiff, | |
| vs. | |
| WESTERN SURETY COMPANY, a South Dakota corporation, | |
| Third-Party Defendant. | |

This matter is before the Court on the Motion for Summary Judgment (Filing No. 80) submitted by Third-Party Defendant Western Surety Company ("Western Surety"); The Motion for Partial Summary Judgment (Filing No. 85) and Motion in Limine to Exclude Expert Testimony (Filing No. 88) submitted by Plaintiff and Counter Defendant Paul Reed Construction & Supply, Inc. ("PRC"); and the Motion in Limine to Preclude Expert Testimony (Filing No. 91) submitted by Defendant, Counter Claimant, and Third-Party Plaintiff Arcon, Inc. ("Arcon"). For the reasons that follow, Western Surety's Motion for Summary Judgment will be denied; PRC's Motion for Partial Summary Judgment will be granted in part; PRC's Motion in Limine will be granted; and Arcon's Motion in Limine will be granted in part.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts are those stated in the briefs and supported by pinpoint citations to evidence in the record, those the parties have admitted, and those the parties have not properly resisted as required NECivR 56.11 and Federal Rule of Civil Procedure 56.

The Nebraska Department of Roads ("NDOR") had a construction project in Keith County, Nebraska (the "Project").   Before August 1, 2010, NDOR and Upper Plains Contracting, Inc. ("UPCI") entered into a contract (the "Prime Contract"), in which UPCI served as general contractor, furnishing labor and material for the Project, including removal and replacement of a portion of Nebraska highway.

On August 31, 2010, UPCI entered into a written subcontract (the "Contract") with PRC, a Nebraska corporation, for the performance of a certain portion of UPCI's scope of work on the Project.   Among other things, the Contract required PRC to crush the asphalt and concrete highway surface.

On or about April 5, 2011[1], PRC entered into a subcontract (the "Subcontract") with Arcon, a Colorado corporation, for the performance of certain aspects of the Project, including "crushing."   The Subcontract defined the services to be provided by Arcon through incorporation of Arcon's bid proposal.   The bid proposal provided that:

> Arcon is responsible for crushing services only.   Tear out, demolition, removal, stockpiling, placement, compaction, and any other processing or construction is not included.

(Filing No. 87-2, at ECF 2 and Filing No. 92-1, at ECF 39; *See* Filing No. 87-2, at ECF 2-4, ECF 6 and Filing No. 92-1, at ECF 32-33, ECF 38-39.)

---

[1] The Contract bears the date 3/28/2011 (Filing No. 87-2, ECF at 4 and Filing No. 92-1, ECF at 33.)

2

The Subcontract also contained Article XIV (the "Change Order Provision"):

The Contractor reserves the right, and without notice to the Subcontractor's sureties to make changes in the material to be furnished or work to be performed under this Subcontract, or additions thereto or omissions there from [sic] upon written order to the Subcontractor. Any additions or reductions to be made to or from the amount of the Subcontract price resulting from changes in work or materials furnished shall be agreed upon in writing by the parties hereto, such agreement not being valid unless signed by an officer of the Contractor. No addition or reduction in subcontract price shall be binding on the Contractor unless so agreed upon in writing. Any claim for adjustment in the Subcontract price must be made in writing within 10 days of the date such changes are ordered. In case the Owner orders the Contractor to make any changes in the work [and] such change requires a change to be made in the work of this Subcontractor, the Subcontract shall be equitably adjusted on account of such changes subject to any applicable provisions of the Contract between the Owner and the Contractor. In the event the Subcontractor desires to claim additional compensation for any reason involving alleged fault of the Contractor, it shall give notice of such claim within 10 days following the occurrence which gave rise to such claim. Failure of the Subcontractor to deliver such notice in a timely manner shall be deemed a waiver of its right to recover any costs incurred more than 10 days before the date on which it gives such notice. [2]

(Filing No. 87-2, ECF at 7 and Filing No. 92-1, ECF at 36.)

PRC began work on the Project sometime between April 1, 2011 and April 7, 2011, and asked Arcon to have its equipment at the Project site by April 11, 2011. Arcon incurred standby costs associated with having to pay for its crew and equipment, waiting for PRC to give approval for Arcon to start crushing.  Arcon did not start crushing until May 10, 2011. During the first three weeks of crushing, Arcon encountered problems with the size of the slabs of concrete that PRC prepped and presented to Arcon for crushing, and problems with a lack of water available for its

---

[2] Arcon disputes this language on the grounds of "completeness," but does not dispute the existence or substance of the Change Order Provision in the Subcontract.  The Court supplied the bracketed conjunction, pertaining to a clause not at issue in this dispute.

crusher.  On the first day Arcon began work, it advised Brad Benson ("Benson"), UPCI's Project Manager, that Arcon's contract provided only for "crushing," not "breaking." Arcon used its equipment to break the concrete into smaller sizes before crushing it.

From early May 2011 through late June 2011, Donna Schultejann ("Schultejann") of Arcon sent e-mails to Adam Reed ("Reed"), Vice President and Chief Operating Officer of PRC, notifying him of the problems and delays caused by PRC's failure to break the concrete into chunks Arcon could crush, and PRC's failure to provide water for Arcon.  Schultejann also notified PRC by email that Arcon was "essentially doing the majority of the demo" to keep the Project moving and that they needed to reach an agreement for additional compensation regarding use of Arcon's equipment to break the material, as well as compensation for its standby time.  PRC acknowledged the problems and delays and that PRC's impactor was not breaking the concrete.  Arcon sent PRC several messages seeking opportunities to discuss its compensation.  In response, Reed offered to "discuss this more."  At some point Reed asked Arcon to get a second crusher.  On June 3, 2011, Schultejann notified PRC that in order to stay on schedule, Arcon was asking to work Sundays.  Arcon asked PRC to make note of this request and to ask UPCI and NDOR for authorization.

PRC did not issue any written change orders, and Arcon never received any written change orders from PRC.  Between May and July of 2011, Arcon submitted at least three invoices to PRC including Invoice 702, Invoice 707, and Invoice 708 (collectively "the Invoices").  On May 24, 2011, Arcon submitted Invoice 702 in the amount of $17,650.00 seeking additional compensation for work performed pursuant to the Project.  On June 27, 2011, Arcon submitted Invoice 707, in the amount of

4

$30,318.27, seeking additional compensation for work performed pursuant to the Project.  By July 21, 2011, Arcon completed all its work on the Project.  On July 31, 2011, Arcon submitted Invoice 708 claiming $209,322.08 for additional compensation for work performed pursuant to the Project.

When disagreement arose regarding Arcon's scope of work, UPCI reviewed Arcon's Subcontract and told PRC that UPCI could not be an advocate for PRC because the Subcontract was clear that Arcon's price was for crushing only.

Western Surety Company, a South Dakota corporation, furnished Payment and Performance Bonds with UPCI as the principal, NDOR as an obligee, and the Project subcontractors and suppliers as additional obligees.

Western Surety's Payment Bond (the "Bond") stated in part:

"NOW THEREFORE, if said **UPPER PLAINS CONTRACTING, INC.** as principal shall in all respects fulfill this said contract according to the terms and the tenor thereof, and shall faithfully discharge the duties and obligations therein assumed, then the obligation is to be void and of no effect; otherwise to be and remain in full force and virtue in law.

It is expressly understood and agreed that this bond is given to secure and does secure not only the faithful performance by the principal herein named of said contract for the construction of the work as specified in said contract and in strict accordance with the terms of said contract and the plans, specifications and all special provisions made a part thereof; but that it is given to secure also the payment by the said bounden **UPPER PLAINS CONTRACTING, INC.** of all overpayments made to said principal by the Department of Roads, and of all just claims to all laborers and mechanics for labor that shall be performed, and for the payment of all materials, supplies and equipment which is used or rented in performing the contract, . . . and if such payments be made then this obligation shall be null and void; otherwise it shall remain in full force and effect.[3]

---

[3] Arcon also disputes this language on the grounds of "completeness," but it does not dispute the existence or substance of the Bond.

(Arcon's Third-Party Complaint, Filing No. 3, at ECF 9 (bold-face in original).)

On January 27, 2012, PRC filed its Complaint in the District Court of Scotts Bluff County Nebraska, and Arcon removed the action to this Court on February 3, 2012, invoking the Court's diversity jurisdiction.

PRC has two remaining claims: In its first cause of action PRC seeks declaratory relief related to the Subcontract, and in its second cause of action it seeks damages for Arcon's alleged breach of the Subcontract.

Arcon counterclaimed against PRC for (1) breach of contract, (2) misrepresentation, (3) quantum meruit, and (4) unjust enrichment. Arcon also filed a Third-Party Complaint against Western Surety seeking a judgment for amounts Arcon claims it is owed under the Bond for its work on the Project.

Western Surety moved for summary judgment, essentially arguing that the work for which Arcon is seeking payment was outside the scope of the Subcontract and that Arcon did not provide proper and timely notice of its claim. PRC moved for partial summary judgment, essentially seeking dismissal of all Arcon's claims against PRC. Both PRC and Arcon have moved, in limine, to preclude certain expert testimony from each other's witnesses.

## SUMMARY JUDGMENT STANDARD OF REVIEW

"Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, demonstrates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gage v. HSM Elec. Prot. Servs., Inc.,* 655 F.3d 821, 825 (8th Cir. 2011) (citing Fed. R. Civ. P. 56(c)).

The court will view "all facts in the light most favorable to the nonmoving party and mak[e] all reasonable inferences in [that party's] favor." *Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 819 (8th Cir 2011). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of material fact." *Id.* at 325. Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.*

In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "'a genuine issue of material fact' such that [its] claim should proceed to trial." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting *Matsushita*, 475 U.S. at 586-87)), *cert. denied*, 132 S. Ct. 513 (2011). "'[T]he mere existence of some alleged factual dispute between the parties'" will not defeat an otherwise properly supported motion for summary judgment. *Quinn v. St. Louis County.*, 653 F.3d 745, 751 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

In other words, in deciding "a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party"– where there is no "genuine issue for trial"–summary judgment is appropriate. *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## MOTIONS FOR SUMMARY JUDGMENT

## I.  PRC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

In its Motion for Partial Summary Judgment, PRC asks the Court to grant summary judgment in favor of PRC and find that:

(1)  Arcon's Quantum Meruit and Unjust Enrichment Claims are barred by the existence of the Subcontract that governs Arcon's claims for changed and/or extra work.

(2) Arcon's Breach of Contract Claim is barred by the Subcontract to the extent the claim seeks compensation for work in Invoices 702, 707, and 708 because Arcon failed to obtain written change orders for such work.

(3) Arcon's Breach of Contract Claim is barred by the Subcontract to extent the claim seeks compensation for work in Invoices 702, 707, and 708 for which Arcon failed to provide timely written notice.

### A.  *Arcon's Quantum Meruit and Unjust Enrichment Claims*

PRC contends that Arcon's quantum meruit and unjust enrichment claims are barred by the Subcontract because it governs Arcon's claims for changed and/or extra work.  Arcon claims that all its tear-out work, demolition work, removal work, asphalt

work, and standby time were the result of either a modification of the Arcon Subcontract or an entirely new implied contract between PRC and Arcon.

Quantum meruit and unjust enrichment are equitable actions based on the theory of implied contract, and, consequently, are only proper in instances where the parties do not have an express contract. *See Siebler Heating & Air Conditioning v. Jenson*, 326 N.W.2d 182, 184 (Neb.1982).[4]  Under Nebraska law,[5] "a plaintiff is permitted to plead both express contract and quasi-contract in the same petition." *Byrne v. Hauptman, O'Brien, Wolf & Lathrop, P.C.*, 608 N.W.2d 208, 213 (Neb. 2000).  However, "there cannot be an express and an implied contract for the same thing existing at the same time . . . ."[6] *Wrede v. Exchange Bank of Gibbon*, 531 N.W.2d 523, 530 (Neb.1995). "[A]n implied contract cannot arise where an enforceable contract exists between the parties as to the same subject matter . . . ." *Assoc. Wrecking and Salvage Co. v. Wiekhorst Bros. Excavating & Equip. Co.,* 424 N.W.2d 343, 348 (Neb.1988).

Nevertheless, in *Wiekhorst* the Nebraska Supreme Court held that "an implied contract on a point not covered by an express contract is not superseded by the express contract . . . ." 424 N.W.2d at 350.  A plaintiff may recover on "a quantum

---

[4] "It is only when parties do not expressly agree that the law interposes and raises a promise.  No agreement can be implied where there is an express one existing. Thus, an express contract precludes the existence of a contract implied by law or a quasi-contract." *Siebler Heating & Air Conditioning v. Jenson,* 326 N.W.2d 182, 184 (Neb.1982).

[5] Contracts for construction in Nebraska are governed by Nebraska law.  *See* Neb. Rev. Stat. § 45-1209(2).

[6] In a supplemental brief to the Court (Filing No. 111), Arcon cites *City of Scottsbluff v. Waste Connection of Nebraska*, Inc., 809 N.W.2d 725, 739-40 (Neb. 2011) for the principle that parties may have express and implied contracts governing the same subject matter and that the scope of such contracts is a question for the jury.  *City of Scottsbluff* is distinguishable from this case because it addressed services performed *after* a 10 year contract for the same services expired.  *Id.  City of Scottsbluff did*  not address express and implied contracts governing the same subject at the same time.

9

meruit theory . . . *supplement[ing]* an express contract theory, not . . . act[ing] as a *substitute* for it." *Id.* at 348. In *Wiekhorst* the court considered an action involving express oral contracts for equipment rental and work performed under a general contract on a city sewer project. *Id.* The parties disputed the scope of the oral agreements, but "[w]ith respect to the additional work to be performed, if any, by either party, there was no agreement." *Id.* at 349.

Here, there is an express, valid contract—the Subcontract—governing the same subject matter that Arcon now asserts as the basis of quantum meruit and unjust enrichment claims.

Unlike the agreement in *Wiekhorst*, the agreement between PRC and Arcon contains provisions governing additional work. To allow Arcon to proceed with its claims for quantum meruit and unjust enrichment would render the express contractual language null and void. Because the parties have an express contract governing the same subject matter that forms the basis for Arcon's quantum meruit and unjust enrichment claims, those claims are precluded by the existence of the Subcontract.

### B. Arcon's Breach of Contract Claim

PRC contends that Arcon's breach of contract claim is barred by the Subcontract to the extent the claim seeks compensation for work reflected in the Invoices, because Arcon failed to obtain written change orders. PRC also contends that Arcon's breach of contract claim is barred by the Subcontract because Arcon failed to provide timely written notice of its claims for additional compensation or adjustments in accordance with the Subcontract's Change Order Provision.

10

Arcon argues: (1) the Change Order Provision does not apply to the additional work reflected in the invoices because that work was performed under an implied contract; (2) the Change Order Provision does not apply because PRC breached the Subcontract by failing to pay amounts due Arcon under Invoice 709; and/or 3) PRC waived the "writing" and "notice" requirements of the Change Order Provision by its conduct. As noted above, Arcon's first argument fails because the parties have an express contract governing the same subject matter that forms the basis of Arcon's "implied contract" claims, therefore, the work Arcon performed pursuant to the Project is within the scope of the Change Order Provision.

### 1. PRC's Alleged Breach of Contract by Failing to Pay Invoice 709

Arcon argues that the Change Order Provision is not applicable because PRC breached the Subcontract, rendering it and the Change Order Provision void. Arcon provides no persuasive authority to support this position, and the record does not contain sufficient evidence for the Court to conclude that PRC breached the Subcontract.

The Subcontract provides that "[u]pon completion of Arcon's work and acceptance of crushed concrete spec by owner, [PRC] shall release full payment of the subcontract, including any retainage withheld." (Filing No. 92-1, at ECF 38.) Arcon claims that pursuant to this section of the Subcontract, PRC was required to pay Arcon the amounts billed in Invoice 709, and for delays and additional costs. Arcon admits, however, that it owes its suppliers not less than $153,609.99, and pursuant to Articles II and XXIV of the Subcontract, PRC may withhold monies, such as those Arcon claims

under Invoice 709, until Arcon resolves its outstanding payment obligations to its suppliers.

As for Arcon's argument that PRC breached the Subcontract by causing delays, such delays might well constitute a "fault of the Contractor" under the Subcontract, giving rise to a right on the part of Arcon to claim additional compensation. It is not apparent, however, that a delay, even if caused by the fault of the Contractor, is a breach of the Subcontract. Accordingly, Arcon's arguments based on PRC's alleged breach of the Subcontract fail.

### 2. Waiver of the Change Order Provision

Under Nebraska law, "[i]t is well-established that the parties to a contract may avoid [a written change order] provision where their words, acts, or conduct amount to a waiver, modification, rescission, abrogation, or abandonment of the provision, or the party claiming the benefit of the provision is estopped to rely on it." *D. K. Meyer Corp. v. Bevco, Inc.*, 292 N.W.2d 773, 775 (Neb. 1980) (quoting *Griffin v. Geneva Industries, Inc.*, 228 N.W.2d 880, 882 (Neb. 1975)). "The interpretation given a contract by the parties themselves while engaged in the performance of the contract is one of the best indications of the true intent of the parties and, ordinarily, that construction of the contract should be enforced." *Richards v. Bycroft*, 249 N.W.2d 743, 745 (Neb. 1977).

The Nebraska Supreme Court has stated that a defendant cannot deny that a plaintiff is entitled to compensation because it failed to obtain prior approval for additional work where the defendant "[1] knew about . . . additional work performed . . . and [2] its conduct indicated approval and authorization for work to proceed." *D. K. Meyer*, 292 N.W.2d at 775 (quoting *Griffin*, 228 N.W.2d at 882). Accordingly, a party to

12

a contract may waive a change order provision even when it does not direct the other party to perform the extra work.

In *D. K. Meyer*, a subcontractor entered into an agreement wherein it was responsible for the erection of a roof support structure for a new building. *Id.* at 774. The agreement provided that "no extra work shall be allowed or changes made by the Sub-Contractor, or paid for by the Contractor unless and until authorized by the Contractor or his superintendent in writing before the work and/or changes are begun." *Id.* at 775. As a result of error in design that was not the fault of the subcontractor, the subcontractor performed modifications to the roof support structure that were necessary for the completion of the project. *Id.* at 777. The modifications were not contemplated by the original agreement. *Id.* at 775. The record did not clearly indicate which party specifically authorized the modifications; however, it was clear that all parties to the construction project agreed that modifications were necessary. *Id.* at 774. The subcontractor incurred extra expenses because of the modifications, and the contractor refused to pay because the subcontractor did not first receive a written change order pursuant to the change order provision in the agreement. *Id.* at 774-75.

The Nebraska Supreme Court affirmed the lower court's ruling in favor of the subcontractor noting that "[t]he record sustain[ed] the conclusion that the parties . . . ignored the provision of the contract requiring a written change order prior to the modification of the project." *Id.* at 775. The court noted the following key facts in support of its conclusion that the contractor's "actions clearly demonstrated a modification of the contract and recognized that the subcontractor was due money for the extra costs incurred as a result of the modifications":

13

The job supervisor from [the subcontractor] testified that the work performed in the modifications was not originally contemplated in the contract. The project manager from [the contractor] testified that the modifications caused [the subcontractor] to incur costs not originally contemplated in the contract for erection of the steel space grid. Moreover, correspondence between [the contractor] and the architectural firm which designed the building indicates knowledge and acceptance of the extra costs incurred by [the subcontractor] and a request by [the contractor] to the architect that a change order be issued to [the contractor] for the costs of said modifications. In fact, in its request for a change order, [the contractor] demanded a 7 percent markup for itself on the costs of modification, but the request for the change order was denied. Whether or not the owner chose to modify its contract with [the contractor] in regard to any written change orders is immaterial on the question of whether [the contractor's] actions amounted to a modification of its own contract with [the subcontractor].

*Id.*

The plain meaning of "crushing services" is not clear from the contents of the Subcontract and is subject to at least two reasonable interpretations.  Therefore, as a matter of law, the meaning of "crushing services" is a question of fact.[7]  Viewing the facts in the light most favorable to Arcon, this Court assumes that Arcon performed work in addition to "crushing services," including asphalt crushing, concrete breaking, demolition, tear-out, and standby time for equipment and labor while Arcon was required to perform non-crushing work and while Arcon awaited PRC's performance.

Arcon argues that PRC waived the Change Order Provision by its conduct when it, *inter alia*,

(a)  Ignored and failed to object to Arcon's e-mails that <u>notified</u> PRC that Arcon would be seeking compensation for (1) the demo, tear-out and processing work it had performed and would be performing in the future;

---

[7] "Whether a contract is ambiguous is a question of law . . . . A document is ambiguous if a word, phrase, or provision in the document has, or is susceptible of, at least two reasonable but conflicting interpretations . . . . If a contract is ambiguous, the meaning of the contract is a question of fact . . . ." *Plambeck v. Union Pac. R. Co.*, 783, 509 N.W.2d 17, 20 (Neb. 1993).

14

(2) the cost incurred from its crushing crew and equipment being forced to stand by and wait for Arcon's excavator to break the concrete down to a proper size for crushing; and the additional labor and crushing equipment that PRC demanded to get the Project schedule back on track;

(b)  Ignored and failed to object to Arcon's written e-mail that <u>requested</u> PRC to reach an agreement for additional compensation regarding the use of Arcon's equipment to break the material and the stand-by time of Arcon's crushing crew and equipment;

(c)  Ignored and failed to object to Arcon's e-mail that <u>requested</u> PRC to obtain a change order from NDOR for some of the additional work;

(d)  Received Invoice 702 on May 24, 2011 and Invoice 708 on June 27, 2011, for the demo, tear-out work and crushing stand-by time, <u>but waited until</u> July 19, 2011 (two days before Arcon completed its work on the Project) to deny the Invoices;

(e)  [P]ressured Arcon to continue its crushing and non-crushing work and <u>threatened</u> to replace Arcon if it did not obtain an additional crusher to keep the Project moving, with the knowledge that Arcon would be seeking compensation for said work and equipment once the Project was completed;

(f)  [I]nstructed Arcon to get a second crew to keep PRC's original schedule, with full knowledge that Arcon would be seeking compensation for said work once the Project was completed; and

(g)  [R]epresented to Arcon that "it agreed" that Arcon was entitled to compensation for the asphalt work in Invoice 707 and <u>adversely fought</u> UPCI to compensate Arcon for such work.

(Arcon's Brief in Opposition to PRC's Motion for Partial Summary Judgment, Filing No. 102 at 27-28 (emphasis in original) (citations omitted).)

Assuming for purposes of this Motion that asphalt crushing, the removing and breaking of large slabs of concrete, and standby time for such work, constituted additional work under the Subcontract, then the record contains sufficient evidence to support a finding that PRC knew about such additional work and by its actions and

inactions approved it.  The record indicates that Arcon incurred costs for such additional work; PRC knew of the additional costs; and PRC accepted or approved at least some of the extra costs.

Genuine issues of material fact remain for trial regarding the meaning of "crushing services," as that term is used in the Subcontract, and as to PRC's alleged waiver of the terms of the Change Order Provision.  Accordingly, PRC's Motion for Partial Summary Judgment will be denied with respect to Arcon's breach of contract claim against PRC based on the theory of waiver.

## II.  Western Surety's Motion for Summary Judgment

Western Surety claims the work Arcon performed was (1) not covered by the Bond because it was not performed pursuant to any contractual obligation, and/or (2) barred by Arcon's failure to comply with the notice requirements of Neb. Rev. Stat. § 52-118.01.

As stated above, genuine issues of material fact remain regarding whether Arcon's work was outside its Subcontract.  Viewing the available record in the light most favorable to Arcon, a reasonable finder of fact could conclude that Arcon performed extra work and PRC waived the Change Order Provision.  Accordingly, the work for which Arcon seeks payment could be considered work performed pursuant to the Subcontract, and Arcon should be permitted to make its claims under the Bond.

Neb. Rev. Stat. § 52-118.01, provides in pertinent part:

Any person having a direct contractual relationship with a subcontractor but no contractual relationship, express or implied, with the contractor furnishing such bond or bonds shall have a right of action upon the bond or bonds upon giving written notice to the contractor within four months from the date on which such person did or performed the last of the labor

16

or furnished or supplied the last of the material for which such claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied or for whom the labor was done or performed. Such notice shall be served by mailing the same by registered or certified mail, postage prepaid, in an envelope addressed to the contractor at any place he or she maintains an office or conducts his or her business or his or her residence or in any other manner in which a notice may be served.

Because Arcon had a direct contractual relationship with PRC, a subcontractor of UPCI, but no contractual relationship with UPCI, Arcon was required to provide UPCI with timely notice of Arcon's claims under the Western Surety bond.  Arcon's work on the Project was completed on July 21, 2011, so any notice under § 52-118.01 was due to UPCI on or before November 21, 2011.  Arcon argues that its claim was timely under § 52-118.01 because (1) on the first day Arcon began work on the Project, it advised Brad Benson, Project Manager for UPCI, that Arcon's contract provided for crushing not breaking; (2) on August 2, 2011, Schultejann sent Benson an e-mail stating that Arcon "would have to place a claim on the project for the concrete dispute" and she wanted Benson and UPCI "to be aware of the situation first"; and (3) Arcon sent its claim to Western Surety on September 27, 2011.

While is does not appear that Arcon stated with substantial accuracy the amount claimed in its communications with UPCI, or effected written notice to UPCI in conformity with § 52-118.01, and while such deficiencies may provide Western Surety with an affirmative defense to Arcon's claim, Western Surety raised no such affirmative defense in its Answer (Filing No. 27) and such a defense may not be asserted otherwise.  *See* Fed. R. Civ. P. 8(c). Accordingly, Western Surety's Motion for Summary Judgment will be denied.

17

## RULE 701 AND 702 STANDARDS OF REVIEW

Federal Rule of Evidence Rule 702 allows for the admission of expert opinions. Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In light of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999),[8] this Court must screen proffered expert testimony for relevance and reliability. *See Bland v. Verizon Wireless, (VAW) L.L.C.,* 538 F.3d 893, 896 (8th Cir. 2008). A reliable opinion must be based on scientific methodology rather than on subjective belief or unsupported speculation. *See Turner v. Iowa Fire Equip. Co.,* 229 F.3d 1202, 1208 (8th Cir. 2000). In assessing reliability, the Court should consider factors including whether the proposed expert's theory, methodology or technique: (1) can be and has been tested; (2) has been subjected to peer review; (3) has a known or potential rate of error; and (4) is generally accepted by the relevant community. *Bland*, 538 F.3d at 896. This list of factors is not exclusive,

---

[8] The Supreme Court has held that *Daubert* applies to all expert testimony, not only scientific expert testimony. *Kumho Tire Co.,* 526 U.S. at 141.

and this Court is allowed "great flexibility" in its analysis. *Jaurequi v. Carter Mfg. Co.,*173 F.3d 1076, 1082 (8th Cir. 1999).

The expert's information or opinion must also "assist" the trier of fact in understanding or determining a fact in issue. Fed. R. Evid. 702(a). "This condition goes primarily to relevance." *Daubert*, 509 U.S. at 591.

Throughout the Court's assessment of the admissibility of an expert's opinion, *Daubert* makes clear that the Court "should also be mindful of other applicable rules," such as Fed. R. Evid. 403,[9] which states:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Fed. R. Evid. 701 States:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> **(a)** rationally based on the witness's perception;
>
> **(b)** helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> **(c)** not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

---

[9] *Daubert*, 509 U.S. at 595; *see also United States v. Kime*, 99 F.3d 870, 884 (8th Cir. 1996) (quoting *Daubert*, 509 U.S. at 595):

> *Daubert* makes it clear that when assessing the admissibility of proffered scientific expert testimony under Rule 702, the trial court must also take into account the interplay of other relevant rules of evidence, such as Rule 403: "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses."

**ANALYSIS OF MOTIONS IN LIMINE**

**I.  PRC's Motion in Limine**

PRC moved in limine to preclude expert testimony from Russell W. Andrews ("Andrews") to the extent Andrews intends to opine about Arcon's entitlement to damages and/or the reasonableness and amount of Arcon's damages.  PRC contends that Andrews failed to use a reliable methodology when rendering his opinion.

Andrews is the Vice President of Colorado Cleanup Corporation.  He has 40 years of education, training, and experience in the demolition and excavation industry including the demolition, processing, and crushing of concrete.  After litigation arose, Arcon engaged the services of Andrews to provide opinions with respect to Arcon's claims.  Pursuant to Fed. R. Civ. P. 26, Arcon disclosed Andrews as an expert witness opining about standard of care in the crushing industry and Arcon's entitlement to damages and/or the reasonableness and amount of damages.

Rule 702 requires that an expert articulate the principles and methods used in reaching the proffered opinions.  If the expert fails to do so, then the court is unable to determine whether the expert has used the correct principles and methods, or whether the expert has reliably applied such principles and methods in the particular case. *In re Canvas Specialty, Inc.*, 261 B.R. 12, 21 (Bankr. C.D. Cal. 2001).

By his own admission, Andrews did not engage in any analysis or employ any accepted methodology for evaluating the Invoices and/or the accuracy or reasonableness of Arcon's alleged damages.  During his deposition, when Andrews was asked about whether he did "anything to necessarily verify that the costs were incurred," he responded by saying, "I had looked at her submittals on her extra costs

20

that she submitted to [PRC]. But did I go through their payroll, accounting, and stuff, no, I did not."

Andrew's also failed to provide any reliable basis for his opinions, therefore his opinions regarding Arcon's entitlement to damages and the accuracy or reasonableness of the Invoices are not capable of review and do not satisfy the criteria required by Rule 702. Accordingly, Andrews will be limited to offering his opinions as an expert regarding standards of care and business customs in the crushing industry, to the extent those opinions are relevant. He will not be permitted to testify regarding Arcon's entitlement to damages and/or the reasonableness and amount of Arcon's damages.

## II.  Arcon's Motion in Limine

Arcon moved in limine to preclude any expert opinion testimony by Reed on the grounds that his opinions are (1) not relevant, and (2) either not expert opinions or not opinions Reed is qualified to give under Rule 702. Arcon's Motion challenges Reed's opinions related to Arcon's inadequate performance, failure to document its claims, and failure to act in accordance with industry standards and practices. Arcon does not challenge the admissibility of Reed's testimony under Rule 701.

In support of its motion, Arcon notes that this Court concluded PRC was "happy with how [Arcon] performed" (Memorandum and Order on Granite Re's Motion for Summary Judgment, Filing No. 60, at 6) and therefore PRC should be precluded from re-litigating the quality of Arcon's performance under the Subcontract. Arcon further argues that Reed does not meet the minimum requirements of *Daubert* and *Kumho Tire* to offer expert opinions, because his opinions are based on subjective beliefs or

21

unsupported speculation and will not assist the trier of fact to determine any fact in issue.

In opposition to Arcon's motion, PRC contends that it will use Reed as a fact witness pursuant to Rule 701, and that it disclosed Reed as a potential expert witness out of an abundance of caution, not knowing whether Arcon might argue that some of Reed's opinions fall within the scope of Rule 702.  PRC contends that Reed's opinions are relevant lay opinions, but to the extent the Court may determine that Reed's opinions are governed by Rule 702, Reed is qualified as an expert.

Arcon counters that Rules 701 and 702 are mutually exclusive, and PRC may not offer Reed's opinions under both rules.

Reed's opinions related to the scope, method, and quality of work performed by Arcon pursuant to the Project may be relevant to issues of fact remaining in dispute. Notwithstanding language in the Court's earlier Memorandum and Order, the quality of Arcon's performance has not been adjudicated.  PRC's disclosure of Reed's opinions as "expert" opinions out of an abundance of caution does not preclude PRC from offering fact testimony and lay opinions from Reed.  Reed may not offer opinions about what the law requires, nor conclusions of law.   To the extent that opinions about industry standards and practices are "expert" opinions, PRC will have the opportunity to lay proper foundation at trial.

**CONCLUSION**

PRC's Motion for Partial Summary Judgment will be granted in part; Western Surety's Motion for Summary Judgment will be denied; PRC's Motion in Limine will be granted; and Arcon's Motion in Limine will be granted in part.

22

Accordingly,

IT IS ORDERED:

1.  PRC's Motion for Partial Summary Judgment (Filing No. 85) is granted in part,

> a.  Arcon's quantum meruit and unjust enrichment claims are barred by the Subcontract;

> b.  The remainder of PRC's Motion for Summary Judgment regarding Arcon's breach of contract claim is denied;

2.   Western Surety's Motion for Summary Judgment and Request for Oral Argument (Filing No. 80) is denied;

3.  PRC's Motion in Limine (Filing No. 88) is granted, and Russell W. Andrews will be precluded from offering expert opinions regarding Arcon's entitlement to damages and the accuracy and/or reasonableness of its Invoices;

4.  Arcon's Motion in Limine (Filing No. 91) is granted in part,

> a.  Adam Reed will be precluded from offering opinions as to what the law requires, or conclusions of law; and

> b.   the Motion in Limine is otherwise denied, without prejudice to Arcon raising objections at the time of trial.

Dated this 16th day of January, 2014.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge
